J-S53002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: X. E. A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: F. M. R., MOTHER | No. 817 EDA 2017 |

Appeal from the Decree Entered February 2, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000919-2015
CP-51-DP-0001708-2013

| IN THE INTEREST OF: X. A. A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: F. M. R., MOTHER | No. 822 EDA 2017 |

Appeal from the Decree Entered February 2, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000954-2015
CP-51-DP-0001721-2013

BEFORE: BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED OCTOBER 11, 2017**

F.M.R. ("Mother") appeals from the decrees entered February 2, 2017, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated Mother's parental rights to her minor twin children, daughter X.E.A., and son X.A.A. (collectively, "the Children") (born in August of 2013), pursuant to sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. After careful review of the record and applicable law, we affirm.

The trial court set forth the following findings of fact in its Pa.R.A.P. 1925(a) opinion:

On August 10, 2013, [Philadelphia County Department of Human Services, Children and Youth Division ("DHS")] received a General Protective Services ("GPS") Report stating Mother gave birth to the twin Children [in August of 2013] at Temple University Hospital ("TUH"). The GPS alleged the [Children] were born at 36 weeks gestation and each weighed less than five (5) pounds at birth. Prior to the birth of her Children, Mother had been arrested on May 6, 2013[,] due to an active bench warrant. On August 13, 2013, DHS obtained an Order of Protective Custody ("OPC") for Child[,] X.E.A. On August 14, 2013, DHS obtained an OPC for Child[,] X.A.A.

An adjudicatory hearing was held on August 30, 2013. The Honorable Jonathan Irvine adjudicated the Children dependent due in part to Mother's incarceration at the Curran-Fromhold Correctional Facility.

Mother was released from prison on February 2, 2015. At the permanency review hearing on February 9, 2015, Mother appeared before the Honorable Jonathan Irvine, who ordered[:] (1) that the Children remain as committed; (2) Mother was to visit the Children weekly; (3) Mother was referred to the [c]ourt's Clinical Evaluation Unit ("CEU") for a dual diagnosis and random drug screens; and that (4) Mother be referred to the Achieving Reunification Center ("ARC") for services.

On May 12, 2015, CEU completed a Progress Report regarding Mother stating that she failed to complete a drug and alcohol assessment as ordered by the [c]ourt. On November 4, 2015, Mother gave birth to another child. Mother had failed to receive substance abuse treatment during her pregnancy and was discharged from the ARC program twice for noncompliance.

On or about December 22, 2016, DHS filed the underlying Petition to Terminate Mother's Parental Rights to the Children[,] X.E.A. and X.A.A. On February 2, 2017, this [c]ourt terminated Mother's parental rights to Children pursuant to 23 Pa.C.S.[] § 2511(a)(1)[,](2)[,](5)[,] and (8). The [c]ourt also ruled that termination of Mother's parental rights was in the best interests of the Children pursuant to 23 Pa.C.S.[] § 2511(b). The [c]ourt ordered that the Children's goal be changed to adoption.

Trial Court Opinion ("TCO"), 4/24/17, at 2-3 (citations to record omitted).

Thereafter, Mother timely filed notices of appeal on March 2, 2017, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated Mother's appeals *sua sponte* on April 3, 2017.

Mother now raises the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 Pa.C.S.[] § 2511(a)(1), (a)(2), (a)(5), and (a)(8)[,] as [M]other made progress towards working and meeting her [Single Case Plan ("SCP")] goals, namely staying drug free, working towards obtaining housing, working on parenting skills, and other goals, during [the Children's] placement?

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of [the Children,] as required by the Adoption Act[,] 23 Pa.C.S.[] § 2511(b)?

Mother's Brief at 4.

We review an appeal from the termination of parental rights under the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36

A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, … 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, … 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decrees pursuant to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties.  Parental duty is best understood in relation to the needs of a child.  A

- 6 -

child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010).

Instantly, Mother argues that the evidence demonstrates her attempt to establish a loving relationship with the Children. *See* Mother's Brief at 7. Additionally, Mother claims that her efforts to remain close to the Children and her attempt to complete her objectives "exhibited that she was trying to eradicate any neglect or abuse that caused [the Children] to be placed in foster care." *Id.* at 8. However, the record clearly belies Mother's claims.

First, Mother's own testimony contradicts her claim that she attempted to complete her objectives. Mother stated at the termination hearing that there was "no point" in her attending ARC services because "it don't benefit [her]," and that "it's too much weight for [her] to handle." N.T. Termination, 2/2/17, at 56-57. Mother also indicated that she did not have

transportation to get to the ARC programs. *Id.* at 57. She admitted that she was aware she could request transportation tokens from [the Community Umbrella Agency ("CUA")] 48 hours in advance of her appointments, but that she never complied with the 48-hour requirement. *Id.* at 57-58.

Moreover, DHS reports:

Mother was compliant with services while still incarcerated. However, once Mother was released from prison and expected to show initiative in order to complete her SCP objectives, she was unable to do so and thus failed in meeting her objectives. She did not attend services at ARC, failed to maintain contact with the CUA, and failed to attend the majority of her visits.

Not only did Mother lack the initiative to pursue reunification with Children, she also struggled with her limited capacity to undertake the parental role. When given the opportunity to take on a limited parental roll in a supervised setting, Mother failed to attend the majority of her visits. Of the few visits she did attend with Children, all of which were supervised, she would curse in front of them. Beyond these limited visits, Mother never took care of Children on a daily basis. Mother's behavior and lapses demonstrated that Mother lacked both the intent and willingness to parent and the "reasonable firmness" required by § 2511(a)(2).

DHS's Brief at 17-18 (citations to record omitted).

The trial court concluded that "[t]he record demonstrated Mother's ongoing unwillingness to provide care or control for the Children[,] to perform any parental duties[,] and a failure to remedy the conditions that brought the Children into care." TCO at 4. The court emphasized the fact that the Children had never once lived with Mother and had received parental care from their foster parents since birth. *Id.* at 5. The court also

found persuasive the testimony of the CUA Representative, who noted that

Mother's SCP objectives were: (1) to maintain contact with CUA; (2) to visit

the Children; (3) to complete random drug screens; (4) to comply with the

ARC program; and (5) to complete a CEU assessment. *Id.*

> The CUA Representative testified that Mother had not maintained consistent contact with CUA since August 2016. The CUA Representative also testified that Mother was sporadic with visitation of the Children. Specifically, Mother was scheduled to visit the Children on a weekly basis but made only five (5) visits since October 4, 2016. The CUA Representative testified that Mother had failed to complete the ARC program.[1] The CUA Representative also testified that Mother failed to complete a court ordered parenting program, and that Mother was unemployed and did not have suitable housing.[2] By her own testimony, Mother confirmed that she was unemployed and did not have stable housing.[3]

_____

[1] Mother was referred to ARC for parenting, housing, employment, and mental health services. At the time of the termination hearing, Mother had not completed any of these programs. Rather, the CUA Representative testified that Mother was "closed out from ARC" due to lack of attendance. N.T. Termination at 17-19.

[2] Mother was not placed on a list to receive appropriate housing, because she failed to complete the ARC housing program. *Id.* at 18. Instead, Mother had numerous living arrangements since her release from prison, including staying with a friend, staying at a shelter, moving in with her mom and, most recently, residing with her uncle. *Id.* at 59.

[3] When asked what effort she made to try to obtain housing, Mother testified: "I don't have a job. So, there was no point in me getting a house for myself." *Id.* at 60. Mother also testified that because of her incarceration, she has been unable to find a job, and that she relies on her mother and siblings for financial support. *Id.* at 60-61, 68.

*Id.* at 5-6 (citations to record omitted). The trial court found the testimony of the CUA Representative to be credible and accorded it great weight. *Id.* at 6. After careful review, we deem the court's decision to terminate Mother's parental rights, pursuant to section 2511(a)(2), to be well-supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but the focus is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the trial court concluded that it would be in the Children's best interests for Mother's parental rights to be terminated. The court emphasized that the Children have never lived with Mother and that they have received parental care from their foster parents since birth. TCO at 4-5. Mother argues that the trial court erred in terminating her parental rights, because DHS failed to provide the court with clear, competent, and convincing evidence that termination was in the best interest of the Children, pursuant to 23 Pa.C.S. § 2511(b). Mother's Brief at 6. Mother claims that she offers the Children "love, comfort, security, and closeness-entailed in a parent-child relationship," *id.* at 10, and further suggests that the record reflects her efforts to comply with her objectives "in attempts to make herself a better parent and reunify with her [C]hildren because [she] loves her [C]hildren." *Id.* at 11.

Again, we conclude that the record supports the trial court's decision to terminate Mother's parental rights. The CUA Representative testified that Mother has never lived with or cared for the Children, nor has she ever maintained consistent contact with them. *See* N.T. Termination at 11-15, 20. In contrast, DHS reports:

> Children share a strong maternal bond with their Foster Mother, with whom they have lived since birth. Foster Mother was their primary parental bond. Foster Mother provided Children with love, safety, stability, and support. Children knew no other person as their motherly figure. Children would run to Foster

Mother at the end of visits with Mother.[4]  Foster Mother took care of them when they were sick and made sure that they received proper education.  Children were thriving with Foster Mother.

DHS's Brief at 23.

In reaching its conclusion that termination of Mother's parental rights would be in the best interests of the Children pursuant to 23 Pa.C.S. § 2511(b), the trial court explained that it relied on the CUA Representative's testimony that:  (1) Mother had never cared for the Children and that she lacked the ability to care for them on a full-time basis; (2) the Children's pre-adoptive foster mother was able to meet the Children's medical and educational needs; (3) the Children were bonded to their foster mother; (4) it would be in the Children's best interest to be adopted; and (5) termination of Mother's parental rights would not harm the Children and would be in the Children's best interest.  TCO at 6.

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding the Children's needs and welfare, and the absence of any bond with Mother, we conclude that the court did not abuse its discretion as to section 2511(b).  **See S.P.**, 47 A.3d at 826-27.  Accordingly, we affirm the decrees terminating Mother's parental rights to the Children.

_____

[4] Even Mother testified that at the end of her visits with the Children, "[i]t's like they're in a rush to leave…. Like when the foster mom comes, it's like they in a rush to leave.  Like they want to go."  N.T. Termination at 65.

Decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/11/2017</u>